# United States Court of Appeals
## For the First Circuit

No. 02-1153

CAPE FEAR, INC.,

Petitioner, Appellant,

v.

DENNIS A. MARTIN AND SUSAN ALLEN,

Claimants, Appellees.

JAMES E. HALEY AND JOSEPH LEMIEUX,

Claimants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Howard, Circuit Judge.

Thomas J. Muzyka with whom Robert E. Collins and Clinton & Muzyka, P.C. were on brief for appellant.
Carolyn M. Latti with whom David F. Anderson, David J. Berg, and Latti & Anderson LLP were on brief for appellees.

November 1, 2002

**COFFIN**, **Senior Circuit Judge**.    This case arises from the sinking of a clamming vessel off the coast of New Bedford, Massachusetts, causing the deaths of two crew members.  Appellant, the vessel's owner,[1] filed a petition in admiralty seeking exoneration or limitation of liability under the Limitation of Liability Act ("the Limitation Act"), 46 U.S.C. app. §§ 181-196. The district court rejected the petition and found that the vessel was unseaworthy, leaving appellant fully exposed to pending damage claims.  We affirm.

## I. Background

The F/V CAPE FEAR had been on a routine clamming trip out of New Bedford, Massachusetts, in January 1999 when the vessel, fully loaded with ocean quahogs, ran into trouble in stormy weather as it headed back to port.  The boat carried a crew of five: Captain Steven Novack, Mate James Haley, and deckhands Steven Reeves, Paul Martin, and Joseph Lemieux.[2]  As the boat approached New Bedford, the waves washing up on deck were not receding as they usually did. Novack ordered the crew members to don survival suits, and, a few minutes later, ordered them to abandon ship.  Novack and Reeves, with their survival suits only partially on, slid down the

---

[1] Appellant is Cape Fear, Inc., whose officers and owners are Warren Alexander and his ex-wife.

[2] Lemieux was the only crew member to testify in the district court proceeding, and the description of what occurred on the day of the sinking is therefore drawn entirely from his testimony.

starboard side hull as the vessel rolled to port, but Lemieux, with his suit unzipped at the neck, was thrown into the water on the port side of the now capsized vessel. Those three had last seen Haley and Martin in the galley putting on their survival suits.

Lemieux testified that, once he was in the water, he heard other crew members screaming. Lemieux's suit was filling up with water because it was not fastened at the neck, but Haley soon approached with a board and told Lemieux to grab onto it. Haley and Lemieux then swam to Captain Novack, apparently the closest other crew member. The three men heard Reeves crying for help, but could not find him. After about ten minutes, Reeves' yelling stopped.

Another clamming vessel, the F/V MISTY DAWN, approached and rescued Novack, Haley and Lemieux. The MISTY DAWN unsuccessfully searched for Martin and Reeves for thirty to forty-five minutes. The next day, Martin's body was found floating off a beach on Buzzard's Bay, where the boat sank. According to the testimony of Officer Michael Camire of the State Environmental Police, Martin's survival suit was on, but zipped only to his navel. His strobe light was in the off position. Reeves' body was never found.

The cause of the vessel's sinking is the central dispute in this case. The district court concluded that the CAPE FEAR, as it began its return to port, "was unseaworthy because substantially overloaded with clams in cages, a practice that had become common

. . . ." It found that the heavy load, which weighed the boat down and risked its stability, was the primary reason the boat capsized in the rough conditions it encountered on its last voyage. The court ruled that the overloading rendered the boat unseaworthy, and that appellant was strictly liable for damages resulting from that condition. The court listed additional factors that contributed to the boat's unseaworthiness, including problems with safety equipment, but it did not rely on these in finding that the CAPE FEAR was unseaworthy.

Appellant, however, argues that the CAPE FEAR sank because the crew members on that particular day negligently failed to close a hatch cover over one of the clam tanks, allowing water to build up in the lower level of the vessel and undermining its stability. A total of six clam tanks stood on the CAPE FEAR's lower deck. They were arranged side-by-side, forward to aft, running from bow to stern. The two most forward tanks were labeled as #1 port and starboard, the two in the middle were #2 port and starboard, and the last two were #3 port and starboard. Each tank had a separate hatch cover that was attached to a set of rails and was moved into place using a pulley system. A watertight longitudinal bulkhead separated the starboard clam tanks from the port clam tanks, but the transverse bulkheads separating the #1, #2 and #3 tanks on each side were not watertight.

Lemieux's undisputed testimony was that the #3 port side tank cover was left open that day about three to five inches. There is a dispute, however, concerning the reason for that opening. Lemieux reported that the hatch cover was prevented from closing completely by a problem with the rope that was used to pull the cover into place. The rope had broken on other occasions, he testified, and crew members would tie a knot in it until the line could be spliced. The knot, however, would interfere with the pulley system and leave the hatch cover partially open.[3] Appellant, by contrast, maintained that the cover was left open improperly by the crew members responsible for closing it, unbeknownst to either Captain Novack, Mate Haley, or company president Alexander. The opening created by the partially closed cover was a "downflooding" point,[4] and the district court concluded

---

[3] Lemieux's testimony on how long the condition had existed before the final trip appears somewhat inconsistent. When asked "for how long had there been a knot in that rope, your best estimate?" he answered: "Probably the two trips prior to this one and the last trip." Several questions later, when asked whether he had "observed the No. 3 port hatch open, as on this trip," he answered: "There had been a few trips previous. Not the two trips before, but there had been other trips at different times where that has happened before . . . and they just tied a knot in it to continue working." The difference in the responses may have been simply a function of the different questions asked: while he believed the knot that existed on the final trip had been present for the vessel's two prior trips, he may have not actually seen the knot on those trips, as he had on "other trips at different times." Lemieux was a fill-in deckhand on the Cape Fear, and he worked about half of the vessel's trips.

[4] "Downflooding" refers to the progressive entry of water into the hull, eventually resulting in flooding and loss of stability.

that it contributed to the vessel's unseaworthiness; as with the safety equipment, however, the court did not rely on the hatch cover to reach its unseaworthiness determination.

The evidence showed that another possible location for water to accumulate and contribute to flooding was the space between the #2 and #3 hatch covers on both the port and starboard sides. The #3 hatch covers were about four inches below the #2 hatch covers, and they slid beneath the #1 and #2 hatch covers on a separate set of rails. Lemieux testified that, with the covers closed, about a one-inch gap remained.[5]

Appellant filed its Petition for Exoneration from and/or Limitation of Liability on June 17, 1999 and submitted an appraisal reporting that the F/V CAPE FEAR had no value and no pending freight.[6]  Under the Limitation Act, a vessel owner may seek to

According to testimony at trial, a "downflooding point" is an opening on a vessel of at least 3.6 square inches that cannot be closed and is thus not watertight, and which leads to a major compartment below deck. An open pipe or open doorway are examples of possible downflooding points.

[5] Alexander, the vessel's owner, testified that the gap was about one quarter inch, which would not be wide enough to qualify as a downflooding point. The district court did not explicitly address this factual conflict, but its finding of unseaworthiness based on overloading makes it likely that the court credited Lemieux's testimony and believed that water entered both sides of the hull through this gap.

[6] "Pending freight" is the total earnings anticipated for the voyage, including charges for carriage of cargo and passengers. Mediterranean Shipping Co. S.A. Geneva v. POL-Atlantic, 229 F.3d 397, 400 n.5 (2d Cir. 2000); Caribbean Sea Transport, Ltd. v. Russo, 748 F.2d 622, 626 (11th Cir. 1984).

limit its liability for any maritime injury or loss to the value of the vessel and its pending freight, provided that the owner lacks privity or knowledge concerning the events that gave rise to the damage. Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 453 (2001); Hellenic Inc. v. Bridgeline Gas Distribution LLC, 252 F.3d 391, 394 (5th Cir. 2001); Carr v. PMS Fishing Corp., 191 F.3d 1, 4 (1st Cir. 1999). In the process of seeking limited liability under the statute, a vessel owner also may request exoneration, or freedom from all liability. Lewis, 531 U.S. at 453.[7]

After hearing six days of testimony, the district court found that appellant was entitled to neither exoneration nor limitation of liability. It ruled initially that limitation was unavailable because appellant failed to prove the value of the vessel, and then went on to find liability based on unseaworthiness. Appellant argues on appeal that the court's conclusion of liability was based on clearly erroneous factual findings. It further asserts that, even if the unseaworthiness determination is upheld, no liability should result because it lacked privity or knowledge of any

_____

[7] The Limitation Act does not expressly extend to exoneration, but courts often consider full immunity from liability along with the limitation question. See generally Lewis, 531 U.S. at 453-54; see also Riverway Harbor Service, St. Louis, Inc. v. Bridge & Crane Inspection, Inc., 263 F.3d 786, 792 (8th Cir. 2001). In some circumstances not relevant here, courts are obliged to respect a claimant's choice to have the issue of exoneration decided in state court. See Lewis, 531 U.S. at 451-55.

unseaworthy condition.  Finally, appellant argues that, in the absence of privity or knowledge, its liability was capped by the value of the vessel after its sinking, and that that value was adequately proven to be zero.

Our review of the record persuades us that the district court did not commit clear error in its finding of unseaworthiness.  As we explain below, its rejection of limitation of liability also is, on the state of this record, unassailable.

## II. Discussion

A trial court's findings after a bench trial are reviewed generously under a clear error standard, see Carr, 191 F.3d at 6, and "[w]hen the proof supports plausible but competing inferences, the trier's choice between them cannot be clearly erroneous," id. at 7.  With that standard in mind, we first consider the court's conclusion that the CAPE FEAR was unseaworthy, which was the foundation for its finding that appellant was fully liable in damages to the claimants.  We then turn to the limitation of liability issue.

### A. The CAPE FEAR's seaworthiness

A ship owner has an absolute duty to provide a seaworthy vessel, and this duty extends beyond the physical integrity of the vessel and its equipment to such other circumstances as the procedures crew members are instructed to use for assigned tasks. Underwriters at Lloyd's v. Labarca, 260 F.3d 3, 7 (1st Cir.

2001)(citing <u>Vargas</u> v. <u>McNamara</u>, 608 F.2d 15, 18 (lst Cir. 1979), for the proposition that "a jury could conclude that the vessel was unseaworthy due to the unsafe procedure crewm[e]n were directed to employ for cleaning the engine room").  It is well established that the seaworthiness of a vessel includes its capacity to carry its intended cargo: "[i]f a vessel is loaded so heavily that she cannot safely sail on the voyage contracted for, she is unseaworthy." 2A <u>Benedict on Admiralty</u> § 67.  <u>See</u>, <u>e.g.</u>, <u>The Silvia</u>, 171 U.S. 462, 464 (1898) ("The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport."); <u>Mobil Shipping & Trans. Co.</u> v. <u>Wonshild Liquid Carriers Ltd.</u>, 190 F.3d 64, 68-69 (2d Cir. 1999) (same); <u>Petition of Long</u>, 439 F.2d 109, 113 (2d Cir. 1971) ("The overloading of the SMITH VOYAGER made her an unseaworthy vessel.").

Appellant does not dispute that, if the CAPE FEAR were routinely overloaded with clams, the court properly could find that appellant breached its duty of seaworthiness.  Rather, it maintains that no such overloading occurred.  Appellant relies heavily on the expert testimony of David Folsom, a marine engineer and naval architect, who opined that the vessel met Coast Guard stability standards and was safe for its intended voyage when loaded, as appellant contends it was, with 130 cages that were "topped off" with extra clams to ensure a full load after the original contents of the cages settled.  Although the district court concluded that

the vessel carried 132 cages, appellant maintains there is no record support for any amount over 130.

Putting aside the issue of 132 vs. 130 cages because it makes no difference to our analysis, the record does not inevitably lead to the conclusion that appellant wishes to draw. To analyze the vessel's stability, Folsom needed to select a downflooding point. As we understand his testimony and that of other experts who testified during the proceedings, a standard stability analysis considers whether the vessel is sufficiently stable to withstand expected conditions, including bad weather, recognizing that the downflooding location is a vulnerability.

For the specific stability analysis on which appellant relies, Folsom used as a downflooding point a vent six-and-one-half feet above the main deck that opened into the engine room. He acknowledged, however, that this point would not actually be under water unless the boat capsized. He further testified that if either the open #3 port hatch cover or the one-inch gaps between the #2 and #3 hatch covers were used as a downflooding point, the vessel loaded with 130 full cages would fail the stability analysis.

Thus, the district court could have rejected Folsom's favorable assessment of the boat's stability on the ground that he failed to utilize more realistic points of flooding for that analysis. In

addition, a stability book[8] prepared for the CAPE FEAR's owner by another naval architect about two years before the accident stated that the boat could safely operate with 120 cages and a "freeboard" – the distance from the water line to the deck – of at least eighteen inches. Lemieux testified that the freeboard on the return trip appeared to be about ten inches. Although he admitted this was an estimate and that the freeboard distance could vary with particular waves, we cannot say that it would have been clear error for the court to conclude that – whatever the precise number – the freeboard was less than the minimum eighteen inches recommended. And certainly a plausible inference is that the freeboard was inadequate because the vessel was overloaded, and for that reason was sitting too low in the water.

A finding of unseaworthiness based on overloading is further supported, moreover, by evidence that the CAPE FEAR sank on an even keel, indicating that the water was accumulating on both sides of the vessel and not just on the port side with the open hatch cover. Although the three to five inch gap that Lemieux attributed to the knotted rope undoubtedly exacerbated the situation – and perhaps accounted for the boat's eventual listing to port and capsizing in that direction – the court reasonably could conclude that that gap was not the primary problem. Because the bulkhead between the port

---

[8] A stability book is designed to provide guidance to the operating personnel about how to load a vessel safely.

-11-

and starboard tanks was watertight, the water that evidently was entering on the starboard side could not have originated from the opening in the port side hatch cover. The district court reasonably could have concluded that the short freeboard at the vessel's stern allowed water to enter the gap between the #2 and #3 hatch covers.

Conflicting testimony also was introduced on the other factors cited by the district court as contributing to the boat's lack of seaworthiness. We need not explore those factors, as the court's ruling did not rest on them, but suffice it to say that we find no clear error in its assessment that the CAPE FEAR's emergency preparedness was less than ideal and that "certain problems with the aft hold cover" contributed to the lack of seaworthiness by "permitt[ing] water to enter the Cape Fear's hold much more easily than if it had been shut."[9]

Our review thus demonstrates that the district court had ample record support for its finding that the CAPE FEAR was rendered unseaworthy by overloading. That the evidence also might support a contrary finding is often the inevitable reality when cases

_____

[9] That the hatch was open was not a subject of debate; rather, the parties' dispute centered on the reason for its partial closure. Although the court did not elaborate, we think it a fair assumption that its reference to "certain problems with the aft hold cover" meant that it rejected appellant's suggestion that the cover simply was left open negligently on that trip, instead accepting Lemieux's testimony that a persistent knot in the rope prevented the cover from closing.

present difficult factual questions; it is not, however, a basis for reversal.[10]

B. Limitation of Liability

Even though a ship owner is strictly liable for damages resulting from a vessel's unseaworthiness, see Labarca, 260 F.3d at 8 ("a finding of unseaworthiness is not affected by whether the owner was or was not negligent or at fault"), the liability may be limited to the value of the ship and its freight if the owner can show it lacked both awareness of the unseaworthy condition and privity with anyone who did have knowledge, 46 U.S.C. app. § 183(a). The district court curtailed its discussion of the Limitation Act because it found that appellant failed to prove the value of the CAPE FEAR after the sinking, which is the relevant value under the statute.

Appellant claims that the undisputed evidence is that the vessel had no value, and it maintains that, had the court proceeded

---

[10] In addition to proving unseaworthiness, an "injured seaman must prove that the unseaworthy condition was the sole or proximate cause of the injury sustained." Ferrara v. A. & V. Fishing, Inc., 99 F.3d 449, 453 (1st Cir. 1996); see also Gifford v. American Canadian Caribbean Line, Inc., 276 F.3d 80, 83 (1st Cir. 2002) (the unseaworthy condition must be "a direct and substantial cause" of the injury). Appellant contends that the court utilized an incorrect and insufficient standard of causation when it found that loading the boat with 132 cages made it "highly likely that the F/V CAPE FEAR would sink." We reject this strained interpretation of the court's language. We think it plain that the court found that the overloading was the direct cause of the sinking. What it found "highly likely" was that the overloading problem would trigger a tragedy on that particular voyage, given the bad weather and rough seas.

to the privity or knowledge issue, appellant would have been found entitled to limitation of liability. With a valueless vessel, limitation would eliminate liability entirely.

We decline to review the court's contested ruling on the vessel's value because the record is undisputed and unequivocal in revealing that appellant was aware of the overloading found by the district court. See Benham v. Lenox Sav. Bank, 292 F.3d 46, 49 (1st Cir. 2002) ("Though rare, an appellate court may make findings of fact where the record permits only one resolution of the factual issue."); see also United States v. Puerto Rico, 287 F.3d 212, 218 (1st Cir. 2002) ("[W]e . . . may affirm the judgment on any independent ground that is apparent in the record.").

Although the parties at trial advanced contrary versions of the conduct responsible for the sinking, with different implications for the knowledge and responsibility of the vessel's owner, the court's finding of the primacy of overloading defines the scope of our inquiry as to privity or knowledge. And the testimony of Warren Alexander, president and co-owner of Cape Fear, Inc., provides all of the evidence that is necessary to support a finding of knowledge. He testified that he commissioned the stability analysis of the CAPE FEAR in which a naval architect, Koopman, identified 120 cages as an appropriate load, with a minimum freeboard of eighteen inches. Alexander further testified that, after some trials with different numbers of cages, Captain Novack "felt comfortable" with 134, and

-14-

that the two men finally agreed on 130 as the regular load.  They did not further consult Koopman.

While Alexander and Novack may have felt that the stability book was too conservative and could safely be disregarded, the CAPE FEAR's ultimate demise, as found by the district court, proved their assessment to be incorrect.  Because Alexander, as appellant's principal officer, affirmatively approved the 130-cage load to which the district court properly attributed the vessel's unseaworthiness, limitation of liability is unavailable.

Affirmed.