**Not for Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 04-1733

JUAN R. SANCHEZ,

Plaintiff, Appellant,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Lipez, and Howard, Circuit Judges.

Javier A. Morales Ramos with whom Juan F. Matos Bonet, was on brief, for appellant.
Lisa E. Bhatia-Gautier, Assistant United States Attorney, with whom H.S. Garcia, United States Attorney and Miguel A. Fernandez, Assistant United States Attorney, were on brief, for appellee.

June 3, 2005

**Per Curiam**.  After a bench trial, the district court entered judgment for the United States on Dr. Juan R. Sánchez Infante's claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq., that certain Veteran's Administration ("VA") physicians negligently failed to review his MRI, to discuss the MRI results with him, and to prescribe an anticoagulant therapy that would have averted his 1994 stroke.  Sánchez appeals and we affirm.

## I.

We present a brief overview of the case, saving a more detailed recitation for our analysis.  The following facts are undisputed.

Sánchez began work at the San Juan Veterans Administration Medical Center as a pathologist in 1991.  During his required physical examination, he was diagnosed with diabetes mellitus type II, and placed on Glucotrol to control his elevated blood sugar.  Sánchez was 5'2" tall and weighed between 190 and 210 pounds during the relevant time period.  He did not exercise, had a poor diet and a family history of cardiac problems, and drank socially nearly every day.  Sánchez also worked long hours at the hospital and characterized his duties as stressful.  His medical records from 1991 to 1994 show three blood pressure readings (one normal and two borderline hypertensive by 1994 standards) and consistent difficulties in controlling his blood sugar.

In early 1994, one of Sánchez's colleagues, Dr. Angel Noriega, noticed that Sánchez was falling asleep during the day, and, fearing that Sánchez was suffering from sleep apnea,[1] arranged for an evaluation. Part of the evaluation consisted of a March 7, 1994 polysomnography,[2] which revealed a significant number of apnea episodes during the test period. Noriega also sent Sánchez for a magnetic resonance imagining ("MRI") study, to check for brain lesions indicative of a particularly serious form of sleep apnea. On March 22, 1994, Sánchez had the MRI, which showed no brain lesions and was essentially normal. However, the MRI report included the notation: "Multiple hyperintense focci are seen within the periventricular white matter suggestive of deep white matter ischemic[3] changes. Please, correlate clinically." The medical records do not indicate whether Sánchez's physicians ever acted upon the MRI or discussed it with him. Nonetheless, Sánchez was successfully treated for his sleep apnea condition.

On August 31, 1994, Sánchez suffered a cerebrovascular accident ("CVA"), a "stroke" in common parlance. The stroke left

---

[1]A serious condition in which an individual stops breathing while asleep. See Dorland's Illustrated Medical Dictionary 115-6 (30th ed. 2003).

[2]A diagnostic test for sleep disorders that monitors the patient's relevant physiological functions while he is asleep. See Dorland's Illustrated Medical Dictionary 1485 (30th ed. 2003).

[3]Indicating deficiency in blood flow. See Dorland's Illustrated Medical Dictionary 954 (30th ed. 2003).

him with significant paralysis of the right side of his body, which has required him to walk with a cane or braces and learn to perform his duties as a pathologist with his left hand. The stroke has also caused emotional disturbances and depression. Sánchez was placed on anticoagulant therapy immediately after the stroke. In the following years, Sánchez suffered from a host of other health problems, including two subsequent CVAs, and has been regularly treated by VA physicians. Sánchez claims that, upon requesting his medical records for a 1999 procedure, he learned of the 1994 MRI report for the first time.

Sánchez filed his administrative claim in December 2000, and, after it was denied, he filed this action in the district court on April 17, 2002. As noted, he alleged that the treating VA physicians failed to review the MRI, to discuss the MRI with him, and to provide proper treatment to avert the stroke that he would suffer five months later. The government moved to dismiss on grounds of lack of jurisdiction, arguing that Sánchez failed to file his administrative claim within two years of his 1994 stroke. The court denied the motion because, on the pleading record, there was no indication that Sánchez was aware of the alleged malpractice until he saw the MRI report in October 1999. See generally Gonzalez v. United States, 284 F.3d 281, 288-89 (1st Cir. 2002)(discovery rule tolls running of statute of limitations

-4-

applicable to the filing of the administrative claim that is a prerequisite to an FTCA action).

Six witnesses testified at the bench trial: Sánchez; his medical expert, Dr. Angel Román Franco; two psychiatrists; the original treating physician, Dr. Noriega; and the government's expert, Dr. Antonio Alvarez Berdecía. The gist of Sánchez's claim was that if he had been placed upon anticoagulants after the 1994 MRI, he would not have suffered his stroke.

Dr. Román, a pathologist for the University of Puerto Rico Medical School, testified that there would have been a good chance of avoiding the stroke if Sánchez had been placed on anticoagulants (such as aspirin) at the time of the MRI. Román emphasized Sánchez's apnea, which significantly increased his heart rate and blood pressure, and resulted in oxygen deprivation to his brain that caused "cell death" (as revealed by the ischemic changes in the brain shown in the MRI). Román asserted that the white matter changes shown in the MRI were indicative of "mini strokes" that had already occurred and were harbingers of a larger stroke to come if not prevented with anticoagulant therapy. Román further testified that Sánchez's other risk factors beyond apnea were essentially inconsequential, as his diabetes mellitus had only been present for a short time (as evidenced by his normal kidney functions), his high blood pressure was only marginal and of recent onset, and he had normal cholesterol and triglyceride levels.

-5-

Sánchez testified at length about his experiences, medical treatment, level of disability, and rehabilitation. He stated that he never inquired about the results of the MRI because he had complete confidence in his colleagues. He also stated that he could not have reviewed his own medical records, as that was strictly forbidden by the hospital.

Dr. Noriega,[4] a board certified neurologist, testified that, while he could not specifically recall speaking with Sánchez about the MRI, it was standard hospital practice to discuss test results with patients, and no less so if they were also colleagues. He further testified that he would never have begun Sánchez's sleep apnea treatment without reviewing all test results and discussing them with Sánchez. He also stated that all VA physicians have access to all medical records, including their own, and that, on one occasion, Sánchez brought his own medical records to Noriega. He also testified that the phrase "correlate clinically" on the MRI report meant to relate the radiological findings to any actual physical manifestations in the patient. He stated that Sánchez had no symptoms -- no evidence of "little strokes" -- so there was nothing to treat. He further testified that nothing could have

_____

[4]Noriega had retired from his duties at the VA Hospital some years before, and neither side had arranged for his testimony. Mid-trial, the district judge decided that his testimony was critical and ordered the parties to bring him in as a witness.

been done to prevent this type of stroke, and that he would not have prescribed aspirin out of a fear of hemorrhage.

Dr. Alvarez, a board certified neurologist, testified that Sánchez's stroke was occasioned by small vessel disease that was primarily caused by Sánchez's hypertension and diabetes.[5] He noted that the negative effects of diabetes and hypertension were additive, with hypertension being the primary culprit for such strokes in 70% of the cases. He further testified that Sánchez's hypertension and diabetes were longstanding, as evidenced by Sánchez's left ventricular hypertrophy and diabetic retinopathy.

Alvarez testified that the white matter lesions on the MRI were only just beginning to be noted in 1994, and that their meaning is still the subject of debate today. He was adamant that the white matter changes were not "strokes," and that there was no real treatment available, in 1994 or at present, other than to control the major risk factors – hypertension, diabetes, and obesity. As to risk factor management, Alvarez noted that Sánchez appeared to take poor care of himself, noting his failure to control his blood sugar, to follow a diet, and to monitor his blood pressure. As to anticoagulant therapy, Alvarez emphasized that there was no evidence that aspirin or other anticoagulants were

---

[5]He also noted Sánchez's other risk factors -- obesity, poor diet, lack of exercise, family history of heart problems, and alcohol use.

effective in the primary prevention[6] of strokes. Indeed, he asserted that the primary efficacy of such anticoagulants was in secondary prevention of strokes. Further, he noted that aspirin increased the risk of hemorrhagic strokes, which were typically worse than ischemic strokes. Moreover, he stated that anticoagulants would not have helped Sánchez because his stroke was not caused by a clot. In support of this opinion, he observed that an echocardiogram from the time of the stroke showed no embolic source from the heart and normal blood flow in Sánchez's large arteries. Alvarez also noted that Sánchez showed continued evidence of CVAs even while he was on anticoagulants after his first stroke.

The district court issued a memorandum order dismissing the action as a "no-liability" case. See Sanchez v. United States, No. 02-1590 (D.P.R. Apr. 12, 2004). Relying largely on Noriega's testimony, the court concluded that Sánchez was made aware of the MRI results at the time of his treatment for sleep apnea and had access to his own medical records. Id. at 6. The court also credited the testimony of Alvarez, accepting his conclusions that the white matter lesions on the MRI were secondary to small vessel disease brought about by Sánchez's hypertension and diabetes. Id.

---

[6]The experts distinguished between primary prevention, which they defined as efforts to prevent the initial stroke, and secondary prevention, which they defined as efforts to prevent additional strokes.

-8-

at 6-11. The court found that the VA physicians did not violate any standard of care, Sánchez did nothing to control his risk factors, and anticoagulants would not have been beneficial in preventing Sánchez's stroke (but might have made it worse). Id. As to Román, the district court praised his credentials, but, referring to his prior experience with him in other cases, deemed his testimony unacceptable "Monday-morning quarterbacking" that ignored this case's factual realities. Id. at 11-12.

**II.**

A district court's findings after a bench trial "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed. R. Civ. P. 52(a). A finding is only clearly erroneous if a review of the entire record leads to a definite and firm conviction that an error has been made. See Primus v. United States, 389 F.3d 231, 237 (1st Cir. 2004). "When the proof supports plausible but competing inferences, the trier's choice cannot be clearly erroneous." Cape Fear, Inc. v. Martin, 312 F.3d 496, 500 (1st Cir. 2002)(internal citation and quotation omitted). "That the evidence also might support a contrary finding is often the inevitable reality when cases present difficult factual questions; it is not, however, a basis for reversal." Id. at 502. Further, a district court's credibility determinations are only clearly erroneous when they are "based on testimony that was

inherently implausible, internally inconsistent, or critically impeached." Mitchell v. United States, 141 F.3d 8, 17 (1st Cir. 1998).

In an action under the FTCA, the state law where the alleged tort occurred provides the standard of liability. Mitchell, 141 F.3d at 13. To establish a case of medical malpractice under Puerto Rico law, a plaintiff must prove "(1) the duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances), (2) an act or omission transgressing that duty, and (3) a sufficient causal nexus between the breach and the claimed harm." Cortes-Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 189 (1st Cir. 1997). Puerto Rico law presumes that a treating physician observes a reasonable standard of care in treating a patient, so a plaintiff has the burden of refuting this presumption. Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 78 (1st Cir. 1993).

Although Sánchez asserts a host of overlapping errors by the district court, his claims boil down to two significant issues: (1) whether the court erred in concluding that Sánchez knew about the MRI report in 1994; and (2) whether the court erred in concluding that the failure to discuss the MRI with Sánchez and to prescribe anticoagulant therapy was not the cause of the stroke.

We note at the outset that Sánchez is climbing a steep hill. We must view the record as a whole, so that even if there is

some evidence supporting Sánchez's contentions, we will still affirm if there is evidence supporting the contrary view. See Cape Fear, Inc., 312 F.3d at 500.

We first consider Sánchez's challenge to the district court's conclusion that Sánchez was aware of his MRI results in 1994. Noriega testified that the standard VA hospital practice was to discuss test results with patients,[7] Sánchez had access to his medical records, and Noriega would not have ordered treatment for Sánchez's apnea without discussing all test results with him. While Sánchez argues the truism that testimony regarding "standard practice" must yield to actual events in a specific case, standard practice evidence is nonetheless relevant and properly considered. See generally Fed. R. Evid. 406. The contrary evidence was the absence of notations in the medical record, which Román conceded could occur by mistake, and Sánchez's testimony that the MRI was not discussed with him, which the district court deemed not credible. We cannot fault the district court for doubting Sánchez's account. First, Sánchez's claimed indifference to his test results is at best surprising. Alvarez testified that most physician "patients" are very demanding about test results and tend to read the MRI with the radiologist as soon as it is produced. Second, Sánchez produced no evidence regarding the claimed hospital

_____

[7]Sánchez, Román, and Alvarez all confirmed this VA hospital practice in the course of their own testimony.

-11-

policy that a VA physician cannot review his own medical records. Third, Sánchez's claim as to this policy was undercut by evidence that he regularly returned his medical file to the records room and could obtain copies of his records as he wished. Finally, there is nothing innately suspicious about Noriega's inability to remember a specific discussion about a specific MRI a decade after the fact. In sum, the district court's conclusion is not clearly erroneous.[8]

The district court's conclusions regarding causation of the stroke and possible preventive treatment implicate the experts' differing views. As set forth above, Alvarez and Román disagreed on the relative importance of Sánchez's diabetes and hypertension. They also disagreed on the significance of the white matter changes in the MRI and the appropriateness and likely efficacy of anticoagulant therapy.[9]

---

[8]At oral argument, Sánchez asserted that the record was unclear as to the district court's ultimate finding regarding when Sánchez saw his MRI. Sánchez maintains that the court's conclusion in the memorandum order after the trial that he knew of his MRI results in 1994 is in hopeless conflict with the district court's prior conclusion that he did not see the MRI until 1999 in its order denying the government's motion to dismiss. But the court's initial assessment of the pleadings must of course give way to its factual findings after a full trial on the merits.

[9]Sánchez's contention that the district court inappropriately minimized the relationship between Sánchez's sleep apnea and the stroke is a nonstarter. Both sides agree that he was successfully treated for apnea in 1994. Further, if apnea was a factor in the stroke, the blame would appear to fall on Sánchez, as he conceded that he failed to follow the prescribed therapy prior to his stroke.

Sánchez claims that he was not hypertensive (or only marginally so), and that his diabetes was of too recent an onset to have factored in his stroke. This thesis is based upon the few blood pressure readings for the relevant period in the record[10] and the 1991 diagnosis of diabetes mellitus. But Sánchez's argument ignores the balance of the evidence. First, as to hypertension, Alvarez testified, without significant challenge, that Sánchez had left ventricular hypertrophy, a condition that can only exist with longstanding hypertension. The fact that Sánchez might not have been definitively diagnosed with hypertension does not mean that he did not have it. Second, Sánchez himself conceded that, in 1994, he was aware that he had untreated hypertension. Third, his argument that his blood pressure was merely "borderline" (by 1994 standards) ignores the fact that both experts agreed that such blood pressures were subsequently determined to be dangerously high for diabetics.

As to diabetes, Sánchez ignores Alvarez's testimony that Sánchez's diabetes retinopathy was indicative of longstanding diabetes. While Sánchez attempted to undermine this conclusion by pointing to test results showing normal kidney functions, Alvarez testified, without significant contradiction, that some diabetics have such results. The district court's choice between two

---

[10]The doctors all agreed that one could not positively diagnose hypertension from three scattered blood pressure readings.

interpretations of the significance of Sánchez's diabetes, both with record support, cannot be clear error. See Cape Fear, 312 F.3d at 500. Similarly, the district court's decision to credit Alvarez's testimony over Román's regarding the significance of the white matter changes in MRI, even if both experts' accounts had support in the record, would not constitute clear error.[11]

As to the advisability of using anticoagulant therapy on Sánchez, the balance of the evidence favors Alvarez's view. First, Noriega supported Alvarez's conclusion that anticoagulants would not have prevented a stroke of the type Sánchez suffered and would have increased the risk of a hemorrhage. Second, Alvarez pointed to an electrocardiogram at the time of the stroke, which supported his view that a clot was not involved. Third, Sánchez and Román conceded that Sánchez continued to have CVAs while on anticoagulants. Finally, Román acknowledged that most of the anticoagulant studies that he cited related to secondary rather than primary prevention.

---

[11]The district court did list hypercholesterolemia and hypertriglyceridemia among the conditions that Román failed to consider in rejecting Román's conclusions. Sánchez is correct that Alvarez retreated from the conclusion in his initial report that these maladies were additional contributors to the stroke and acknowledged that most of the test results were normal. Thus, the district court may have errantly included these secondary factors based upon Alvarez's initial report. Nonetheless, Alvarez's thesis was always that hypertension and diabetes were the primary causes, and the district court supportably accepted this thesis, as discussed above.

Moreover, there were other more general factors that justified the decision to accord Román's conclusions less weight. Román conceded that hypertension and diabetes were significant factors in strokes, but did not even mention these matters in his report. His testimony also failed to take into account significant medical evidence, such as Sánchez's left ventricular hypertrophy and diabetic retinopathy, which should at least have warranted a comment. Román also conceded that he had no personal experience managing patients with sleep apnea or CVAs. In sum, the district court accepted Alvarez's assessment on both causation and course of treatment, and our review reveals nothing about his testimony that was implausible, inconsistent, or critically impeached.[12]  See generally Mitchell, 141 F.3d at 17.

Sánchez faults the district court for concluding that he was a careless person who took inadequate care of himself. But to prevail, Sánchez needed to prove that the VA physicians were negligent and that their negligence caused his injury. The

_____

[12] In addressing the district court's decision to credit Alvarez's testimony over Román's, Sánchez suggests that the district court showed an improper bias against Román by commenting on other cases in which Román testified as an expert. We disagree. Prior judicial exposure to an individual is not by itself enough to establish bias, see United States v. Ayala, 289 F.3d 16, 27 (1st Cir. 2002), and the weight accorded to the testimony of a physician regarding an area outside his speciality can be adjusted accordingly, see Mitchell, 141 F.3d at 15. The district judge generally praised Román's credentials, and his criticism was far less derogatory than other comments found not to amount to bias. See, e.g., Malave-Felix v. Volvo Car Corp., 946 F.2d 967, 973 (1st Cir. 1991)("come-for-hire expert" and "Mr. So and So").

district court supportably concluded that Sánchez did not meet this burden, so any comments made by the court as to the true cause of Sánchez's unfortunate illness are largely beside the point.

## III.

For the reasons stated above, the judgment of the district court is **<u>affirmed</u>**.