Patrick J. CARR, Plaintiff, Appellant,

v.

PMS FISHING CORPORATION and F/V Jane and Ursula, Her Gear, Tackle, and Appurtenances, etc., Defendants, Appellees.

No. 99–1088.

United States Court of Appeals, First Circuit.

Heard Aug. 2, 1999.

Decided Aug. 30, 1999.

Joseph G. Abromovitz, with whom George F. Leahy, Marsha A. Morello, and Abromovitz & Leahy, P.C. were on brief, for appellant.

Brian B. Kydd, with whom Paul Antinori and Kneeland & Kydd were on brief, for appellees.

Before SELYA, Circuit Judge, CYR, Senior Circuit Judge, and LIPEZ, Circuit Judge.

SELYA, Circuit Judge.

Like Venus, this appeal arises full-grown from the sea. In the underlying case, a shipowner, PMS Fishing Corporation (PMS), responded to the sinking of its vessel and an injured seaman's ensuing suit by invoking the Limitation of Liability Act, 46 U.S.C. app. §§ 181–196 (Supp. 1999). The district court granted PMS the protection it sought. The seaman appeals, averring that the trial judge misconstrued the burden of proof applicable to limitation of liability (LOL) proceedings and erred in finding that the shipowner lacked privity and knowledge of the vessel's unseaworthiness. Discerning no error, we affirm.

I

We start with the facts. Plaintiff-appellant Patrick J. Carr, along with two investors (Mark Bergeron and Norville Stanley), established PMS in October 1991. PMS then purchased the F/V JANE &

URSULA, a veteran wooden-hulled scalloper. Bergeron and Stanley each owned 25% of PMS's issued and outstanding stock, and Carr—an experienced commercial fisherman who was to oversee operations and captain the vessel—held the balance.

Although a shoreside survey conducted in March 1991 had declared the F/V JANE & URSULA to be in generally good condition, she leaked in the bow on her first voyage under PMS's auspices. PMS had the vessel hauled out and extensively refurbished by a reputable shipyard and master carpenters, under Carr's personal supervision. On her next trip, Carr thought that she handled well, but he and the crew noticed some seepage around the rudder flange and along the rub rail, as well as minor leaking near the cutting box. PMS again had the vessel hauled out, inspected, and repaired. As on the earlier occasion, the rehabilitative work was performed by a reputable shipyard and master carpenters.

After Carr pronounced himself satisfied with the repairs, PMS put the ship back into service. When Carr took her to sea on December 14, 1991, the crew, under his direction, checked repeatedly for leaks. They discovered none during the first twenty-two hours of the voyage.

Around noontime on December 15, the bilge alarm sounded. Inspection revealed water in the engine room up to the floorboards. When pumping proved futile, Carr notified the Coast Guard, which began to evacuate the crew by means of a basket suspended from a helicopter. As the ship's captain, Carr was the last to depart. With no one left to hold the basket's tether and winds of gale proportions blowing, the basket swung into the rigging, its cable snapped, and Carr sustained serious injuries when it tumbled to the deck.

Carr subsequently sued PMS, charging negligence and unseaworthiness. PMS stipulated that the ship was unseaworthy at the time of the mishap and the negligence count (brought under the Jones Act) dropped out of the case. After a seven-day trial, the presiding magistrate judge, *see* 28 U.S.C. § 636(c), with the aid of an advisory jury, *see* Fed.R.Civ.P. 39(c), found that the vessel's unseaworthy condition proximately caused Carr's injuries. Accordingly, he adjudged PMS liable.

In the ensuing LOL proceeding, the parties submitted additional evidence. The judge reserved decision and later wrote a thoughtful rescript. In it, he found that PMS lacked both privity to and knowledge of the vessel's unseaworthy condition and limited PMS's liability to the vessel's current value. Since the F/V JANE & URSULA had ended the voyage on the ocean floor, it had no ascertainable worth. Thus, Carr took nothing.

## II

Before scrutinizing the trial court's rulings, we summarize certain maritime principles that pertain here.

Under federal admiralty law, a shipowner owes its crew a seaworthy vessel. *See Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 90, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). To satisfy this obligation, the vessel must be reasonably fit for its intended use. *See Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); *Ferrara v. A. & V. Fishing, Inc.,* 99 F.3d 449, 453 (1st Cir.1996). As Justice Harlan elucidated the concept in an oft-quoted passage, the ship must be "one that is staunch and strong, that is fitted out with all proper equipment and in good order, and that carries a sufficient and competent crew and complement of officers." *Gutierrez v. Waterman S.S. Corp.,* 373 U.S. 206, 216–17, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963) (Harlan, J., dissenting). A shipowner is absolutely liable for injuries arising from the vessel's unseaworthiness. *See Mitchell,* 362 U.S. at 549, 80 S.Ct. 926; *Seas Shipping,* 328 U.S. at 94, 66 S.Ct. 872.

■ The Limitation of Liability Act, excerpted in the margin,[1] cabins this liability. It provides, in general terms, that an owner's liability cannot exceed the value of its interest in the vessel (and her freight, then pending). The interest is to be valued as of the end of the voyage on which the loss or damage occurs. *See Petition of Zebroid Trawling Corp.*, 428 F.2d 226, 228 (1st Cir.1970) (citing *Place v. Norwich & NY Transp.*, 118 U.S. 468, 490, 6 S.Ct. 1150, 30 L.Ed. 134 (1886)); 3 David E.R. Woolley, Benedict on Admiralty § 63, at 7–29 through 7–30 (7th ed.1998).

■ If the owner-friendly Limitation of Liability Act is viewed as an exception to the rule of absolute liability for unseaworthiness, there is an exception to the exception: this limitation applies only if the shipowner lacked "privity or knowledge" of the act or condition that caused the injury. 46 U.S.C. app. § 183(a). "Privity or knowledge" can be actual or constructive. *See Spencer Kellogg & Sons, Inc. v. Hicks*, 285 U.S. 502, 512, 52 S.Ct. 450, 76 L.Ed. 903 (1932). Either way, the term usually implies some degree of culpable participation or neglected duty on the shipowner's part: that, for example, it committed a negligent act, or knew of an unseaworthy condition but failed to remedy it, or through the exercise of reasonable diligence could have prevented the commission of the act or the onset of the condition. *See Coryell v. Phipps*, 317 U.S. 406, 411, 63 S.Ct. 291, 87 L.Ed. 363 (1943); *Joia v. Jo–Ja Serv. Corp.*, 817 F.2d 908, 913 (1st Cir.1987).

■ LOL proceedings lend themselves to a bifurcated analysis. *See Estate of Muer v. Karbel*, 146 F.3d 410, 415–16 (6th Cir.1998) (collecting cases); *Joia*, 817 F.2d at 912. First, the court must determine whether negligence or unseaworthiness caused the accident. Second, the court must determine whether the shipowner was privy to, or had knowledge of, the causative agent (whether negligence or unseaworthiness). When a corporation owns the vessel, the test is whether culpable participation or neglect of duty can be attributed to an officer, managing agent, supervisor, or other high-level employee of the corporation. *See Coryell*, 317 U.S. at 410–11, 63 S.Ct. 291; *Cupit v. McClanahan Contractors, Inc.*, 1 F.3d 346, 348 (5th Cir.1993); *Empresa Lineas Maritimas Argentinas, S.A. v. United States*, 730 F.2d 153, 155 (4th Cir.1984). In all events, an entitlement to limitation requires an antecedent finding that the vessel owner was not privy to, and had no knowledge of, the decisive act of negligence or condition of unseaworthiness.

■ LOL proceedings engender a divided burden of proof. The claimant bears the initial devoir of persuasion vis-à-vis negligence and unseaworthiness. *See EAC Timberlane v. Pisces, Ltd.*, 745 F.2d 715, 720 (1st Cir.1984). If the claimant succeeds in that first-stage endeavor, the burden then shifts to the shipowner to establish its lack of privity and knowledge. *See Coryell*, 317 U.S. at 409, 63 S.Ct. 291; *Hercules Carriers, Inc. v. Claimant State of Fla.*, 768 F.2d 1558, 1564 (11th Cir. 1985). Both the claimant's and the shipowner's burdens contemplate proof by a fair preponderance of the evidence.

### III

In the case at hand, the parties stipulated that the F/V JANE & URSULA was unseaworthy when she sank. The trial court readily concluded that this un-

---

1. The statute reads in relevant part:

   The liability of the owner of any vessel, whether American or foreign, ... for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not ... exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

   46 U.S.C. app. § 183(a). This provision is subject to certain exceptions for loss of life and bodily injuries, but none that extend to fishing vessels. *See* 46 U.S.C. app. § 183(b), (f).

seaworthiness proximately caused Carr's injuries and that liability existed. Neither side contests that ruling, but Carr appeals from the court's second-stage determination that PMS satisfied the requirements for a statutory limitation of its liability. His appeal rests on two grounds. First, he claims that the court misapprehended the burden of proof and, accordingly, that PMS never proved that it lacked knowledge of unseaworthiness. Second, he calumnizes the court's factual findings, especially the finding that the vessel was seaworthy when it set sail on December 14, and asks us to find the facts differently. Both arguments lack force.

### A

Carr first asseverates that the trial court misapplied the law because it did not require PMS to prove that it lacked knowledge of the *specific* condition of unseaworthiness that precipitated the sinking.[2] To the extent that this asseveration presents a question of law as opposed to a question of fact, it sparks de novo review. *See United States v. Conley*, 156 F.3d 78, 82 (1st Cir.1998); *McCarthy v. Azure*, 22 F.3d 351, 354 (1st Cir.1994).

In mounting this challenge, Carr notes that neither PMS nor the magistrate identified any particular condition of unseaworthiness as having caused the vessel to sink. Building on that foundation, he relies mainly on language gleaned from *Terracciano v. McAlinden Constr. Co.*, 485 F.2d 304 (2d Cir.1973), in which the Second Circuit stated that, to shoulder its burden of proof at the second stage of an LOL proceeding,

a defendant must show how the loss occurred, together with its lack of privity to or knowledge of the asserted cause. If it cannot show how the loss occurred,

a defendant must exhaust all the possibilities, and show that as to each it was without the requisite privity or knowledge.

*Id.* at 307–08. This language, however, cannot be taken literally. By its own admission, the *Terracciano* court based its statement on an earlier opinion. *See id.* at 308 & n. 14 (citing and quoting *The S.S. Hewitt*, 284 F. 911 (S.D.N.Y.1922)). In that seminal case, Judge Learned Hand made it quite clear that, to achieve a limitation of liability, a shipowner need not "go[ ] over the possibilities, item by item." *The S.S. Hewitt*, 284 F. at 912. Rather, the shipowner must "undertake[ ] to prove that, whatever the cause of the loss, he was ignorant of it; that burden he undertakes, with all the possibilities which it may involve." *Id.* Judge Hand's opinion is proof positive that the literalist spin that Carr places on *Terracciano* is not the law.

■ The rule to which we subscribe is that, at the second step of the LOL analysis, the trier must determine whether the shipowner was privy to, or had knowledge of, the particular act of negligence or condition of unseaworthiness that the claimant proved in the first stage. *See Suzuki of Orange Park, Inc. v. Shubert*, 86 F.3d 1060, 1062 (11th Cir.1996); *Joia*, 817 F.2d at 912; *see also* 3 Benedict on Admiralty, *supra*, § 91, at 8–167 (describing as "better reasoned" the rule that, "[w]here some fault is shown, the petitioner then bears the burden of proof to show its lack of privity in or knowledge of *that fault*") (emphasis supplied) (citing, *inter alia*, *Porto Rico Lighterage Co. v. Capitol Constr. Co.*, 287 F.2d 507 (1st Cir.1961)). As Judge Brown so eloquently put it, only those specific actions that a claimant submitted to the jury in the liability phase can "afford the basis for inquiry as to privity and knowledge." *Avera v. Florida Towing Corp.*, 322 F.2d 155, 159–60 (5th Cir.

---

**2.** Carr also conclusorily suggests that the magistrate judge placed the second-stage burden of proof on him, rather than on the shipowner. Here, however, the hearing transcript and the written conclusions of law clearly reveal the magistrate's awareness that PMS bore the burden of proof anent its lack of knowledge, and there is no plausible basis for concluding that the magistrate failed to hold PMS to this explicitly described burden.

1963). In that sense, then, the specificity of the claimant's proof in the first stage of the LOL proceeding determines the level of specificity at which the defendant's second-stage proof must operate.[3]

■ It follows that where, as here, there is a general finding of unseaworthiness in the first stage of an LOL proceeding, the shipowner's proof concerning privity and knowledge suffices as long as the shipowner shows by a fair preponderance of the evidence that it took appropriate steps to ensure, and reasonably believed, that "the ship was well found, properly manned, and staunch, tight, and adequately equipped." *The S.S. Hewitt,* 284 F. at 912. That showing need not be made mechanically, checking off each and every conceivable cause of the loss, but, rather, permits a more global approach—one that entails an overall sifting and weighing of the relevant evidence. *See id.*

■ In the instant case, the ship sank. There was evidence that water filled the engine room, thus affording some indication of the whereabouts of a specific leak. But the crew members who testified could not pinpoint the leak's location. On this record, then, the general cause of the sinking—unseaworthiness—was known, but no more specific cause could be ascertained. Faced with this evidentiary predicate, the trial court appropriately addressed the question of whether the shipowner lacked any actual or constructive knowledge of the vessel's generic unseaworthiness, or, to use Judge Hand's language, whether the shipowner, "whatever the cause of loss, ... was ignorant of it." *Id.* The court then answered this query affirmatively. We think that once *Terracciano* is put into context, it supports, rather than undermines, this approach.[4] Moreover, as long as they are supported by the record, the court's findings are adequate to bottom a limitation of liability, without requiring PMS to go further and show that it lacked knowledge as to any and all possible causes of the sinking.

**B**

■ This brings us to Carr's other assigned error: his claim that the trial court's factual findings were clearly erroneous. The applicable standard of review is forbidding; an appellate court will disturb findings made by a judicial officer at a bench trial only if, after reviewing the record as a whole, it comes away with an abiding conviction that the factfinder stumbled badly. *See Reliance Steel Prods. Co. v. National Fire Ins. Co.,* 880 F.2d 575, 576 (1st Cir.1989); *see also* Fed.R.Civ.P. 52(a). Perscrutation of the record in this case yields no such conviction.

■ The record contains testimony from which a factfinder reasonably could conclude that PMS purchased a used vessel that it reasonably believed was sound; that when problems developed, it commissioned inspections and repairs by competent professionals; that it accepted the advice of those professionals; that PMS spent nearly $100,000 on repairs in a period of approximately two months; and that, when the ship sailed on December 14, 1991, the owner reasonably believed that she was problem-free. The record also contains ample evidence that PMS exercised due diligence in looking after the seaworthiness of the F/V JANE & URSULA and that its principals had no way of knowing that she was unseaworthy (or would soon become so) when she left port on December 14. This evidence includes

---

**3.** This case does present an interesting quirk. Because the parties stipulated that the ship was unseaworthy when she sank, the plaintiff's incentive to show a specific condition of unseaworthiness was somewhat diminished. But this twist was readily foreseeable, and if the plaintiff wanted to avoid being placed in such a situation, he could have either es-

chewed the stipulation or conditioned his acceptance on greater particularization.

**4.** The magistrate judge plainly knew of *Terracciano;* he cited it in his rescript and, for aught that appears, applied its teachings properly.

indisputable proof that PMS arranged for multiple inspections, by well-credentialed inspectors, before the final launch; that it mended all known defects; and that a substantial period of time elapsed between the launch and the onset of trouble. Generally speaking, no more is exigible to satisfy the shipowner's burden. *See Coryell*, 317 U.S. at 409, 412, 63 S.Ct. 291 (explaining that, as a general rule, due diligence on the shipowner's part—in particular, hiring competent professionals—suffices to show lack of culpable knowledge for limitation-of-liability purposes); *Porto Rico Lighterage*, 287 F.2d at 509 (similar).

Here, moreover, the capstone came out of Carr's mouth. (In this respect, it bears repeating that he is not only the claimant, but also an owner of the vessel who served as its master.) Carr testified that he would not have set sail on December 14 if he had any reason to suspect that the ship was unseaworthy in any aspect. As the owner with the greatest maritime expertise and the most access to information about the vessel, his testimony sheds much light on the lack of culpable knowledge fairly attributable to the corporation.

Straining to parry this series of telling thrusts, Carr notes specific actions (e.g., completely removing the sheathing rather than merely recaulking portions of the hull) that PMS omitted during the course of renovations. But due diligence in the repair of vessels, as in other settings, is a matter of degree—and it is almost always for the factfinder, not the appellate court, to determine what combination of actions suffices. By like token, Carr's effort to second-guess the magistrate judge's credibility determinations fizzles. He points out that, in the LOL proceeding, a key witness disavowed earlier testimony in which he had suggested that the ship must have been structurally unsound. But the magistrate, citing the witness's explanation for recanting his earlier testimony (he explained that, on reflection, he realized that the ship would have leaked immediately in that event), explicitly credited the witness's trial testimony. We have said with a regularity bordering on the monotonous that, in a bench trial, credibility calls are for the trier, *see, e.g., Sierra Fria Corp. v. Evans*, 127 F.3d 175, 181–82 (1st Cir.1997); *Anthony v. Sundlun*, 952 F.2d 603, 606 (1st Cir.1991), and we see no basis here for deviating from this salutary maxim.

We explore one last facet of Carr's challenge to the magistrate's findings of fact. He excoriates with particular vigor the finding that the F/V JANE & URSULA was seaworthy when she embarked on her last trip. The history of the vessel, Carr says, shows that she was *never* seaworthy at any time after PMS acquired her. In his view, the ship's consistent leaks evidenced a concealed structural problem and proved persistent unseaworthiness predating the launch.

While this inference is not implausible, it is not inevitable. For one thing, the painstaking attention given the ship's condition immediately prior to her final voyage tends to dispel it and to indicate that the fatal defect developed only after the ship was at sea. For another thing, Carr's own testimony, noted above, belies the inference. Finally, the March 1991 survey (while far from conclusive) strengthens PMS's hand. On this chiaroscuro record, the most that can be said is that the evidence is susceptible to differing interpretations.

That ends the matter. When the proof supports plausible but competing inferences, the trier's choice between them cannot be clearly erroneous. *See Jackson v. United States*, 156 F.3d 230, 233 (1st Cir. 1998); *Cumpiano v. Banco Santander P.R.*, 902 F.2d 148, 156 (1st Cir.1990). So it is here.

## IV

We need go no further. The short of it is that the magistrate judge did not err either in his application of relevant legal rules or in his factual findings. Unlike the

F/V JANE & URSULA, the decision below is watertight.

*Affirmed.*