In the Matter of the Complaint of Peter **RHOTEN** and Karen Rhoten, Owners of the M/V "Just Because" (O.N. 949292) for Exoneration from or Limitation of Liability, Plaintiffs,

Robert B. Bechtold and American Yachts Ltd.; Modern Continental Marine, Inc., d/b/a Marina at James Landing, and Commercial Union Insurance Company; Robert J. Murray, George Allman and Commercial Union Insurance Company; and Nathan Scott Brown and Commercial Union Insurance Company, Claimants,

Peter Rhoten and Karen Rhoten, Third Party Plaintiffs,

v.

R.T. Beatty Insurance Agency, Inc., NLC Insurance Agency, Inc., and NLC Insurance Company, Inc., Third Party Defendants.

No. CIV.A. 00–12307–MBB.

United States District Court, D. Massachusetts.

July 8, 2005.

Brian P. Flanagan, Michael J. Calabro, Flanagan & Hunter, Boston, MA, George A. Balko, III, Bowditch & Dewey, LLP, Worcester, MA, for Plaintiffs.

David J. Farrell, Jr., Law Office Of David J. Farrell, Jr., Edward J. Dewitt, Connors & Farrell, South Chatham, MA, Robert E. Collins, Clinton & Muzyka, Boston, MA, for Claimants.

### *MEMORANDUM AND ORDER*

BOWLER, United States Magistrate Judge.

Plaintiffs Peter and Karen Rhoten ("the Rhotens"), owners of the M/V Just Because, initiated this action in October 2000 by filing a petition for exoneration from or limitation of liability pursuant to the Limitation of Liability Act, 46 U.S.C. §§ 181–196 ("The Limitation Act"), after a fire on October 11, 1999, engulfed and sank their vessel as it lay berthed at the James Landing Marina ("the marina") located in Scituate, Massachusetts. (Docket Entry # 1). The marina as well as a number of neighboring vessels also experienced damage from the fire.

In response to the petition, the following individuals and insurance carriers filed claims against the Rhotens on the basis that their negligence or the unseaworthiness of the vessel[1] was within the Rhotens' privity and knowledge within the meaning of the Limitation Act: (1) claimants Robert B. Bechtold ("Robert Bechtold"), owner of the M/V Star Skipper,[2] and American Yachts Limited ("AYL"), insurer of the vessel (Docket Entry # 6); (2) claimants Robert J. Murray ("Murray") and George Allman ("Allman"), owners of the M/V Sterling Endeavor II, and Commercial Union Insurance Company ("Commercial Union"), which purportedly holds a subrogation claim for repairs to the M/V Sterling Endeavor II (Docket Entry # 9); (3) claimants Modern Continental Marine, Inc., d/b/a Marina at James Landing ("Modern Continental"), and Commercial Union, insurer of the marina, which purportedly holds a subrogation claim for repairs to the marina (Docket Entry # 7); and (4) claimants Nathan Scott Brown ("Brown"), owner of the M/V Kim and Dan Too, and Commercial Union, which purportedly holds a subrogation claim for repairs to the M/V Kim and Dan Too (Docket Entry # 11).

In November 2001, the Rhotens, together with Modern Continental, Commercial

---

1. The focus of the trial as well as the post trial briefs is upon the Rhotens' negligence. Absent an objection filed within 14 days of the date of this opinion, this court concludes that its determination of the Rhotens' negligence obviates the need to address the unseaworthiness of the vessel and the parties thereby waive the unseaworthiness issue.

2. The claim of Robert Bechtold in Civil Action No. 00–12307–MBB (Docket Entry # 6) as well as the answer of defendants Robert Bechtold and Sheralyn S. Bechtold ("Sheralyn Bechtold") in Civil Action No. 02–11648–MBB (Docket Entry # 2) respectively represent that Robert Bechtold is the owner of the M/V Star Skipper and that Sheralyn Bechtold is not an owner of the vessel. Robert and Sheralyn Bechtold's proposed findings and conclusions (Docket Entry # 105), however, identifies both Robert and Sheralyn Bechtold as the owners of the M/V Star Skipper.

Union, Murray, Allman, Brown, Robert Bechtold and AYL, filed a third party complaint against third party defendants R.T. Beatty Insurance Agency, Inc. ("Beatty"), NLC Insurance Agency, Inc. ("NLCIA") and NLC Insurance Company, Inc. ("NLCIC") (collectively: "third party defendants") on the basis that they negligently failed to procure adequate insurance resulting in a $200,000 coverage gap on the M/V Just Because.[3] (Docket Entry # 47). In their answers, the third party defendants request a jury trial. (Docket Entry ## 48 & 49).

Meanwhile, in August 2002, the third party defendants filed a separate action, Civil Action No. 02–11648–MBB, against Robert and Sheralyn Bechtold ("the Bechtolds") and the Rhotens. The third party defendants alleged that the fire originated either on the M/V Just Because or on the M/V Star Skipper. The action raised seven counts of negligence against the Rhotens and/or Murray and Allman on the basis that the respective owners negligently docked and stored the M/V Just Because and the M/V Star Skipper.[4]

All parties filed a stipulated motion to consolidate both actions (Docket Entry # 75) which this court allowed. The parties further agreed to limit the scope of the first trial, tried to this court, to the exoneration, liability and limitation of liability issues. (Docket Entry # 62). If this court found liability, the parties additionally agreed there would "be further discovery and testimony concerning damages sustained by the claimants." (Docket Entry # 62). No action was taken on the third party claims against Beatty, NLCIA and NLCIC with the exception of depositions of the Chubb Group. (Docket Entry # 62).

Hence, in accordance with a procedural order (Docket Entry # 72) and the foregoing agreement of the parties, a ten day bench trial commenced in September 2003. Trial transcripts were not complete until September 2004. The parties submitted proposed findings in December 2004. The issues of the Rhotens' exoneration and limitation of liability, including the origin of the fire as occurring on the M/V Just Because or the M/V Star Skipper, the cause of the fire and the Rhotens' culpable participation, if any, with the fire, are therefore ripe for review.

## FINDINGS OF FACT

The Rhotens purchased the M/V Just Because in 1997. Prior thereto and since the mid–1980s, Peter Rhoten owned and sailed various vessels and was therefore experienced in their operation. He had owned a power vessel since 1990.[5]

The M/V Just Because was a 1989, 47 foot long Jersey vessel. Two diesel engines powered the vessel which also had a central cabin and fly bridge. The Rhotens docked the vessel in a slip at the marina in Scituate during the season.[6]

---

3. The district judge, as opposed to this court, allowed the motion for leave to file the third party complaint. (Docket Entry # 40).

4. Murray and Allman bring negligence counts against the Bechtolds (Count I) and the Rhotens (Counts V). Brown brings negligence counts against the Bechtolds (Count II) and the Rhotens (Count VI). Modern Continental brings negligence counts against the Bechtolds (Count III) and the Rhotens (Count VII). Marine Continental brings an additional negligence count (Count IV) against the Bechtolds alleging a breach of their storage contract with the marina. The third party defendants did not include a separate count or counts of negligence brought by Commercial Union.

5. The Rhotens sold this gasoline powered vessel upon purchasing the M/V Just Because.

6. The Rhotens stored the vessel inside buildings and out of the water during the off season.

Upon purchasing the vessel, the Rhotens instituted a number of improvements. Improvements totaled approximately $17,000 between the end of the 1998 boating season and the October 1999 fire. One such improvement, performed by a repair yard in Plymouth, Massachusetts in September 1997, was the installation of "block heaters in the port and starboard engines." (Tr. 4, p. 9).[7] The heaters heated coolants in the engines thereby keeping them warm and allowing them "to start with less smoke and less wear and tear." (Tr. 1, p. 20). Each heater drew between 12 to 15 amps of power and, lacking thermostats, thereby drew "a constant load." (Tr. 5, p. 124).

Also in September 1997, the repair yard "repaired some wiring on one of the shore cords or shore inlets." (Tr. 4, p. 7). The work consisted of repairing or replacing "some loose wires" by cutting "the ends back and refasten[ing] them." (Tr. 4 p. 7). The repaired wires were located "behind where the shore power inlets went into the vessel" and, after going to a selector switch, ran to an onboard electrical panel. (Tr. 4, pp. 40–41). The wires were not outwardly visible.

The last trip for the M/V Just Because consisted of a short journey to and from Boston harbor. The Rhotens returned from this trip on a Sunday which was slightly more than one week before the fire. The fire occurred at the marina in the early morning hours of Monday October 11, 1999. The Rhotens, who live near the marina in Scituate, sometimes slept overnight on the boat while it was docked at the marina. On Saturday October 9, 1999, they spent the night on the boat. Sunday morning, they awoke, left the boat, went to church and brunch, returned to the boat to "retrieve[ ] some food" and then "went home." (Tr. 1, p. 38).

The marina has a number of finger piers bordering either side of the slips. The finger piers all emanate from a single pier which comes down from a ramp or gangway leading to the parking lot. On the morning of the fire the M/V Just Because was berthed stern-in. The M/V Star Skipper, further along the pier away from the parking lot, occupied the adjacent slip to the port side of the M/V Just Because. As discussed below, the M/V Star Skipper was downwind of the M/V Just Because and the fire traveled in that direction. The M/V Sterling Endeavor II was docked bow-in to the port side of the M/V Star Skipper with, fortunately, an empty slip between the two vessels. The M/V Kim and Dan Too was docked stern-in and in the adjacent starboard slip to the M/V Just Because.

Given the prevailing direction of the wind away from the starboard side of the M/V Just Because, the M/V Kim and Dan Too experienced only radiant heat damage. The finger pier to the starboard side of the M/V Just Because similarly showed "minimal damage." (Tr. 5, p. 44).

A number of residents from the condominiums across the inlet from the marina reported the fire to the Scituate Police Department which then reported it to the Scituate fire department. The Police Department received the first report of the fire at 1:47 a.m. on October 11, 1999.[8] Susan Fichtner, a female resident of the condominium complex, testified to seeing the fire from her bedroom window, telephoning 911 and then seeing the fire department arrive a short time after the

---

**7.** Citations to the record are provided only for direct quotes.

**8.** Various time logs do not exactly correlate although the difference in minutes is not significant.

telephone call. Watching the fire for several hours with her husband, Ernest, they initially saw more flames on the boat to their right, i.e., the M/V Just Because, than on the boat to their left, i.e., the M/V Star Skipper. In quantitative terms, compared to the fire on the boat to the right, the fire on the boat to the left was only "involved 15 percent," according to Ernest Fichtner. (Tr. 2, p. 32).

Neither Ernest nor Susan Fichtner saw the start of the fire. Ernest Fichtner, however, testified that a south wind "blowing at 10 to 15 miles and hour" was pushing and blowing the flames from the boat on the right onto the boat on the left. (Tr. 2, pp. 31–32). Robert Medico, Jr. ("Medico"), who owned a vessel moored at the marina at the time, concurred by describing a "very light wind" blowing "from the Just Because toward the Star Skipper." (Tr. 8, pp. 102–103).

Medico was asleep on board his vessel when the fire ignited. Upon awakening and before the fire department arrived, he looked out the back of his boat and saw a "big ball of fire." [9] (Tr. 8, pp. 77 & 79). After futilely attempting to use a fire extinguisher and calling 911, Medico ran past the sterns of the M/V Star Skipper and the M/V Just Because shielding his face from the fire. He drew a picture of seeing the fire fully engulf the stern of the M/V Star Skipper and only the port side of the M/V Just Because at the time he ran past the sterns of the vessels.[10]

Richard Dennehy ("Dennehy"), who also owned a boat berthed in a slip at the marina at the time of the fire, was sleeping aboard his vessel. The vessel, the M/V Late Surrender, lay stern-in on the other side of the pier in relation to the M/V Just Because and approximately 20 to 25 feet above her and even further above the M/V Star Skipper. Dennehy awoke to a "banging noise" and looking out the stern saw a "bright orange glow." (Tr. 3, pp. 47–48). After calling 911 from his vessel, he exited the M/V Late Surrender and observed the fire "which was slightly diagonal to the stern of [his] boat" and that the "entire [M/V Just Because] was on fire." (Tr. 3, pp. 49–50). Dennehy described the fire as reaching "the entire cockpit area" and the bridge.[11]

After being in the parking lot for approximately ten minutes, Dennehy went out onto a nearby dock that juts out further than the pier with the slips berthing the M/V Just Because and Dennehy's vessel. At this point, Dennehy witnessed flames coming out everywhere from the M/V Just Because. He also saw fire on the starboard side of the M/V Star Skipper.

Consistent with other testimony, Dennehy described the wind as traveling in a direction away from his vessel like the arrow in exhibit C. According to Dennehy, the wind was "very light." (Tr. 3, p. 54).

After Dennehy reached the parking lot but before Medico ran off the pier, Sergeant James A. Gilmartin ("Sergeant Gil-

---

9. The M/V Star Skipper, which Medico describes as "completely engulfed," lay berthed to the stern of his vessel. (Tr. 8, p. 80). He depicts the fire on the M/V Just Because as limited to the port side.

10. Medico is a friend of the Rhotens and visited them on board their boat the day before his deposition.

11. Both Dennehy and Medico exited their boats and reached the marina's parking lot before the arrival of the fire department. More specifically, Dennehy arrived in the parking lot of the marina before Medico and thus witnessed the fire, which he described as throughout the entire cockpit area, before Medico. This court finds Dennehy's testimony more credible than that of Medico.

martin") of the Scituate Police Department arrived. He described the fire as totally engulfing both the M/V Just Because and the M/V Star Skipper. He also observed, for a short time period, a wind storm or draft during which the strength and force of the fire temporarily altered the direction of the prevailing light wind.[12]

Another resident of the same condominium complex videotaped the fire ("the video"). Captain Brian Vincent McGowan ("Captain McGowan") of the Scituate Fire Department, the first fire fighter to arrive at the scene,[13] narrated the video at trial and also wrote the fire report. The video depicts the wind blowing from the M/V Just Because toward the M/V Star Skipper. Captain McGowan likewise testified that the wind was blowing in the direction of the arrow in exhibit 57, i.e., from the southwest. (Tr. 2, p. 71). The wind direction did not change although wind gusts produced by the fire may have pushed the flames in a different direction for brief periods of time.

When Captain McGowan arrived, he witnessed the M/V Just Because "heavily involved with fire" that impinged on the M/V Star Skipper. (Tr. 2, p. 67). Similar to the testimony of Ernest Fichtner, who had viewed the fire before Captain McGowan arrived at the scene, Captain McGowan characterized the fire as engulfing about 50% of the M/V Star Skipper when he got down to the pier.[14] Gathering in intensity

and "rapidly increasing," the fire moved from the M/V Just Because to the M/V Star Skipper which then became "more heavily involved." (Tr. 2, pp. 68 & 95). Fueled by the petroleum byproduct of fiberglass resins, the fire was "one of the most intense" fires Captain McGowan experienced in his 23 years as a member of the Scituate Fire Department. (Tr. 2, p. 92).

The M/V Just Because sank during the course of the fire fighting efforts that morning. The M/V Star Skipper also eventually sank but not until after the M/V Just Because. Having fought at least 20 boat fires during the course of his career, Captain McGowan concluded in the incident report that, "The fire appears to have started in the boat Just Because." (Ex. 1).

Deputy Chief Charles William Curran, Jr. ("Curran"), a full time fire fighter for 35 years, arrived at the scene after Captain McGowan. Upon his arrival, Curran described the M/V Just Because as "fully involved" and the M/V Star Skipper as only "half to three-quarters involved." (Tr. 2, p. 115). As testified to by the majority of the other witnesses, Curran described the wind as blowing from the M/V Just Because in the direction of the M/V Star Skipper. The flames traveled in the same direction as the wind. Having conducted "hundreds" of fire investigations, Curran opined that the fire "started

---

12. When Sergeant Gilmartin arrived at the scene he saw the fire damaging the M/V Kim and Dan Too, which lay starboard of the M/V Just Because. He therefore presumed that the wind was blowing in the opposite direction and changed direction "very shortly" after his arrival. (Tr. 10, p. 14). The discrepancy in wind direction is explainable by virtue of the fact that large fires, such as the one at issue, can produce "wind storms" and that Sergeant Gilmartin more than likely saw such a draft, which is the conclusion reached by Special Agent Wayne Michael Miller of the Office of the United States Boston Bureau of

Alcohol, Tobacco and Firearms ("ATF Agent Miller") who also investigated the fire.

13. As previously indicated, Sergeant Gilmartin of the Scituate police department was the first public official to arrive on the scene.

14. As previously noted, Ernest Fichtner described the fire as involving 15% of the M/V Star Skipper. By the time Captain McGowan arrived, the fire, which was rapidly increasing, engulfed 50% of that vessel.

in the Just Because." (Tr. 2, pp. 113 & 123). In explaining the basis for his opinion, he pointed out that the M/V Kim and Dan Too, which lay berthed above wind on the starboard side of the M/V Just Because, had "only radiant heat damage" with no "flame impingement." (Tr. 2, p. 123).

After the fire, the M/V Just Because and the M/V Star Skipper were hauled out of the water and moved to another part of the marina. Various officials inspected the M/V Just Because on October 13, 1999, in an attempt to determine the cause and origin of the fire. The group included ATF Agent Miller, Jonathan Klopman ("Klopman"), a certified marine surveyor, Arthur J. Murphy, Jr. ("Murphy"), a certified fire investigator,[15] State Trooper Paul F. Letsche, Jr. ("Letsche"), Michael K. Higgins ("Higgins"), a longtime and experienced private fire investigator, David Wiggins, a marine surveyor, and Gerald Kufta, a certified fire investigator.

The focus quickly centered upon the area on the M/V Just Because where the Rhotens' two 30 amp shore power cords connected to the two shore power inlets ("the inlets") on the starboard side of the vessel. The two male electrical inlets, housed in a box, lie slightly aft on the starboard side of the M/V Just Because. Investigating the cause of the fire "as a team" and after systematically delayering the area, the group agreed that the fire originated at this location of the shore power connection on the M/V Just Because. (Tr. 5, p. 22). Delayering a vessel consists of moving the debris in order to access various systems and "expose burn patterns." (Tr. 7, p. 39).

Significantly, burn patterns on the M/V Just Because emanated in a cone or "V" like pattern from the "low burn" area of the inlets on the starboard side of the M/V Just Because. As aptly explained by the unbiased testimony of ATF Agent Miller, who has investigated upwards of 900 fire and explosion scenes, the burn pattern evidenced a fire originating at the two inlets:

Fires tend to burn upward and outward ... When they start somewhere, they tend to burn upward and outward leaving physical patterns that we refer to as V-patterns or cone-shaped patterns. A "V" might be against the wall; but if you move it slightly away from the wall, it becomes more of a cone-shaped pattern. And that was also right in the area of the connectors for the on-shore power just aft of the electric power panel.

(Tr. 4, p. 82).

In addition to the foregoing, photographs taken at the time of the October 1999 investigation, as well as at subsequent examinations, support the conclusion that the fire originated at the two inlets and, carried by the wind, spread from the M/V Just Because onto the M/V Star Skipper. Murphy, who examined and investigated both vessels in October 1999, concluded and this court agrees that the fire originated "[a]t the shore power connection" inlets on the starboard side and then spread across the M/V Just Because to the port side and traveled over the starboard side of the M/V Star Skipper. (Tr. 5, pp. 28–29).

At the time of the fire, the inlets were connected to the Rhotens' two 30 amp shore power cords. Each 30 amp cord had a female end that connected to one of the

---

**15.** Klopman worked in tandem with Murphy. Whereas Murphy specialized in "fire and flame spread," Klopman had "a more precise knowledge of vessel construction and systems." (Tr. 7, pp. 37–38).

male inlets.[16] To obtain shore power for the boat, the other ends of the two 30 amp cords connected to a connector cable in the shape of a "Y" ("the Y connector"). More specifically, the two female ends on the Y connector connected to the two male ends of the 30 amp shore power cords. The Y connector, which the Rhotens stored during voyages in a step box on board the vessel, itself plugged into a single 50 amp power post on the pier.[17]

In disconnecting the vessel from its on shore power source, the Rhotens more frequently than not disconnected the two 30 amp cords from the Y connector.[18] Consequently, the two 30 amp cords oftentimes remained attached to the two male inlets during voyages,[19] particularly during long voyages, as well as when the vessel lay berthed in its slip at the marina. The 30 amp shore power cords remained attached to the inlets the week before the fire and remained attached at the time of the fire.

The fire largely vaporized the upper connection of the inlet and the shore power cord. The vaporization, in addition to other physical evidence, reveals that the fire originated at the connection at the upper inlet.[20] Sifting through the debris of the vessel, four of the six interior contacts, three female and one male, from the connection at the upper inlet were recovered.

In sifting through the debris shortly after the fire, Klopman found the lower connection, charred but intact, of the male inlet and the female end of the shore power cord. Because of its shape, the parties refer to it as "the baked potato." Peter Rhoten remembers last seeing the baked potato at his deposition which took place on August 3, 2001, at his place of business. The Rhotens lost the baked potato which disappeared shortly after this deposition prior to any in depth expert examination.[21]

The baked potato would have provided important information relative to the cause of the fire. First, it would have shown whether the Rhotens employed a locking device to secure "the plug to the shore power inlet." (Tr. 5, p. 113). Second, an examination of the interior female contacts would have allowed a comparison to the recovered female contacts from the upper inlet connection and permitted further support for the exact location of the fire. The disappearance or loss, occurring as it did

16. As discussed *infra*, female contacts recovered from the debris evidence a pre-existing condition and support this court's conclusion that loose connections at the upper inlet caused the electrical fire.

17. Splitting the 50 amp Y connector into two 30 amp cords allowed for the possibility of an excess of 30 amps to travel through one of the two 30 amp cords.

18. On occasion, the Rhotens would return to their berthed vessel and discover that the two 30 amp shore power cords or the Y connector had been moved to a different post or that one of the two 30 amp shore power cords had been disconnected. The overheating on the cords and the Y connector prior to the fire, however, did not result solely, if at all, from this practice. There was no evidence that the cords or the connector were moved or dis-

lodged from where the Rhotens last connected them the final time before the October 1999 fire.

19. If the "vertically aligned" inlets were disconnected from the shore power cords, a screw cap could be affixed to the inlets to make them watertight. (Tr. 1, p. 63). This was infrequently, if ever, performed.

20. Indeed, the Rhotens' expert, James J. Rogers, placed the origin of the fire at the back side of the upper inlet (Tr. 10, p. 113), within *inches of the upper inlet which Klopman* posited as the location of where the fire started (Tr. 7, p. 71).

21. Klopman testified to last seeing the baked potato in the possession of the Rhotens' attorney at Peter Rhoten's deposition at his "place of business." (Tr. 7, p. 99).

shortly after the Rhotens' depositions, appears highly questionable. Moreover, the Rhotens knew the import of the baked potato as evidence in this litigation. This court therefore draws the negative inference,[22] which in any event is established independently by other evidence in the record,[23] that the Rhotens did not use the proper locking device.

On December 1, 1999, in a further attempt to ascertain or confirm the cause of the fire, Murphy, accompanied by Klopman and Robert Mosher, an electrical expert, examined all of the electrical and mechanical systems, including the wiring, of the M/V Just Because. The group systematically eliminated various locations on the vessel as the origin of the fire. Documented by photographs and supported by the physical evidence at the scene, neither the engine department, bilge pump area, electrical circuit board panel,[24] stove nor microwave showed evidence that the fire started at these locations or systems, according to Murphy. Murphy discounted the M/V Just Because's electrical panel as a source because the instrument showed no arcing or evidence of burning from the inside to the outside. Rather, the burn pattern traveled downward from the top of the electrical panel.

The group also carefully examined the wiring harness along the starboard side that led from the shore power inlets to the electrical panel. The underneath gel coat of the wiring remained intact and the wires lacked the beading and arcing which would support the wiring as causing the fire.

The testimony of Stephen William Houghton ("Houghton")[25] fails to convince this court either that the fire originated on the M/V Star Skipper or that it was not caused by one or more loose connections between the upper male inlet and the female end of one of the two 30 amp cords. Although Houghton is a certified fire investigator, he is not overly experienced with investigating boat fires. He also did not take part in the 1999 inspections when the vessel more closely resembled its state at the time of the fire. Indeed, it was not until more than two years after the fire that Houghton even inspected the vessels. He acknowledges that by that time, "the debris was pretty much disheveled" and was not "in the location that it was in at the time the [M/V Just Because] sank or even at the time it was raised." (Tr. 9, p. 51). When Klopman and Murphy returned to Mendon for a further examina-

22. The law regarding negative inferences is well established. "The sponsor of the inference must proffer evidence sufficient to permit the trier to find that the target knew of (a) the claim (that is, the litigation or the potential for litigation), and (b) the document's potential relevance to that claim." *Testa v. Wal–Mart Stores, Inc.,* 144 F.3d 173, 177 (1st Cir.1998). Even if the sponsor establishes this foundation, "the inference is permissive not mandatory." *Testa v. Wal–Mart Stores, Inc.,* 144 F.3d at 177. Thus, if the factfinder believes the loss or destruction was accidental "or for an innocent reason, then the factfinder is free to reject the inference." *Blinzler v. Marriott International, Inc.,* 81 F.3d 1148, 1159 (1st Cir.1996).

23. Most significantly, the Rhotens did not read the owner's guide or the trouble shooting guide therein. Their descriptions of the means by which they attached the Y connector to the 30 amp shore power cords fails to convince this court that they used a proper connection device at the proper ends.

24. A wiring harness extends from the two inlets along the starboard side of the M/V Just Because to the service panel.

25. It was not until August 2001 that Houghton, who testified on behalf of the Rhotens, became involved in this case shortly after the Rhotens' depositions. He inspected the vessels in Mendon, Massachusetts on December 4, 2001.

tion of the vessel on February 21 or 22, 2002, Murphy similarly noted that a "[h]eavy amount of debris had just been thrown on top" of the starboard side of the vessel. (Tr. 5, p. 37). Wiring had been cut and removed by that time.[26] Without a tarp to protect the vessel, there was little, if any, indication of an attempt to preserve the evidence.

Robert Loeser ("Loeser"), who testified on behalf of the Bechtolds and AYL, provided a convincing explanation for the cause of the fire based on the physical evidence found at the scene. Loeser examined two electrical wires recovered by Higgins a little aft of the inlets on the starboard side of the M/V Just Because. The copper wires were welded together or beaded which occurs at a temperature in excess of normal fire temperatures and thereby evidences an "electrical mechanism" as causing the fire. (Tr. 5, p. 143).

Loeser, whose experience was impressive and demeanor honest, also examined three female contacts and the single male contact remaining from the inside of the inlet to shore power cord connection.[27] Unlike the recovered male contact, the female contacts, particularly exhibit 21B, evidenced corrosion, distortion and lacked a smooth surface to better transmit the electrical current into the male inlet. The poorer and poorer connection led to a greater and greater resistance and an increase of heat at this location over time. Put another way, the lack of a smooth surface on the female contacts created more resistance and increased, over time, the heat at the inlet connection.

A poor connection would have produced inlets that were abnormally hot to the touch. There is little, if any, evidence to indicate that the Rhotens had a practice of touching the inlets to ascertain if they were overheated.

Using the familiar equation of watts equals the electrical current squared by the resistance at this loose connection, Loeser convincingly explained how the increased heat generated in the small area of the female contacts as resistance increased eventually caused the fire to ignite given the probable electrical current at the time of the fire. At the time of the fire, the block heaters produced a load of approximately 26 amps on one line of the 30 amp shore power cords. Based on the cycling on and off of various appliances on the boat, the other line drew in the range of 20 amps of electrical current. The result produced an excessive load albeit not the level of 62 amps that would cause the 50 amp power post breaker to trip.

The almost total pulverization of the box housing the inlets provides additional support for this theory. The absence of the standing structural remains of the box led Loeser to the logical conclusion that the fire was "a long-duration burn." (Tr. 5, p. 108). Similar to leaving a soldering iron plugged in, the area remained hot for a few hours and possibly a few days before reaching a temperature hot enough to ignite the plastic enclosure surrounding the female contacts.

The loose connection was in large part due to the Rhotens' failure to use a locking mechanism on the female ends of the 30 amp shore power cords where the cords

---

**26.** This court declines the invitation to draw a negative inference regarding the wiring harness.

**27.** Given his credentials and the honest and straight forward manner in which he testified, Loeser's testimony in this regard was more

convincing than James J. Rogers' testimony. *See* fn. 30.

Higgins found these metal contacts while sifting through debris of the M/V Just Because after it had been moved to Mendon.

connected to the male inlets. The Rhotens' testimony at trial fails to convince this court that they used the proper device on the 30 amp shore power cords in the proper manner. (*See, e.g.,* Tr. 7, pp. 88–92).

As explained by Klopman, "the failure to use the locking rings was critical to the cause of the fire." (Tr. 7, p. 90). Locking rings provide the necessary watertight connection shielding the area and the contacts from weather damage both at the dock and at sea and thereby minimize the resulting damage to the connections. Not using a locking ring also increases the weight upon the female contacts and "lessen[s] the area of contact" thereby "increas[ing] the resistance." (Tr. 5, p. 139).

When the Rhotens purchased at least two of the 30 amp power cords in March and April 1999, they should have seen and read the trouble shooting guide as well as the owner's guide. Not only was the trouble shooting guide prominently displayed on a kiosk at the store where the Rhotens purchased the cords, it is also included on page nine of the owner's guide that accompanied the new cords. Peter Rhoten, however, admittedly did not read the owner's guide or any instructions from the manufacturer of the cords (Marinco), when he purchased the new cords. Instead, the Rhotens "installed" the Marinco Easy Lock on the wrong end of the cord, i.e., the male end, and then also failed to use the preferable inlet "marked Marinco Easy Lock." (Ex. 62; bolding omitted).

The Rhotens' failure to read the instructions not only caused an improper assembly and the failure to use the proper locking device. It also contributed to their failure to examine the cords and the inlets on a regular basis and thereby detect the discoloration on the female ends of the 30 amp shore power cords that was present before the fire occurred. As reflected in the trouble shooting guide on the kiosk and repeated in the owner's guide that Peter Rhoten did not read, "the most common problem with electrical connections are salt water immersion and overheating. Fortunately, overheating can be easily detected and quickly remedied." (Ex. 33, p. 9). The guides then advise the owner in no uncertain terms as follows:

**What to look for ...**

Examine the ends of the shore power cords. Look for discoloration or melting around the blade of the plug (male end) and around the slots of the connector (female end). Examine the facet of the inlet on the boat and look for discoloration or melting around the blades and the inlet. Examine the receptacle on the dock and look for discoloration or deterioration around the slots.

**What causes overheating ...**

If a device shows signs of overheating, it is generally caused by one or two conditions: corrosion on the metal blades or contacts, or bad connections between the wiring device and the wires connected to it ... Corroded contacts do not make a good electrical connection and overheating results. Bad connections between a wiring device and the electrical wires can be a result of loose terminations, corrosion on the wire or terminals, or the wires not being stripped properly so the wire insulation is under the terminals. A bad connection will result in overheating of the terminal, and thus will be visible on the face of the wiring device.

**What to do if ...**

If a wiring device shows signs of overheating, it should be replaced immediately. Do not wait for the problem to get worse. When replacing wiring devices, examine the electrical wire and make sure the wire strands are clean, and are not corroded. Even a new de-

vice cannot make a good connection to corroded wire. Many boat owners think overheating is a result of over loading the circuit, but this is rarely the case. A bad connection in an inlet will also cause the mating connector to overheat. All too frequently a boat owner will merely continue to replace his connector, not realizing that the inlet is causing the problem. Both devices should be replaced in order to prevent the problem from happening again. The same is true for the plug and the receptacle on the dock.

(Ex. 33, p. 9; bolding and ellipses immediately thereafter in originals). Unfortunately, the Rhotens had a poor practice of leaving the two 30 amp shore power cords connected to the inlets.

One of the more damaging moments for the Rhotens at trial occurred when it became apparent that the female end of one of the two branches of the Y connector had two burn marks that were not present on the corresponding male end of the 30 amp shore power cord in use at the time of the fire.[28] The Rhotens, and particularly Karen Rhoten, often disconnected the Y connector from the two 30 amp shore power cords. They must have seen these burn marks upon connecting the cords yet did nothing to address the issue except aesth-

etically by purchasing new 30 amp shore power cords.[29]

Given the physical evidence of the two pre-existing burn marks on one of the female ends of the Y connector and the pre-existing burn marks on two of the male ends of the stored cords on board the vessel (*see, e.g.,* Tr. 8, pp. 52–59 & 65–66) that the Rhotens regularly disconnected prior to the fire, the Rhotens' testimony that they had not seen the pre-fire damage on the Y connector and the 30 amp shore power cords is simply not credible. Indeed, pre-existing burn marks on the male end of one of the stored cords match one of the female ends of the Y connector in use at the time of the fire.

In addition, two of the female ends of the three stored cords that connected to the inlets had exterior damage that predated the fire.[30] (*See, e.g.,* Tr. 8, pp. 56 & 64–65). Further, although the Rhotens did not regularly disconnect the two 30 amp shore power cords from the inlets, they must have done so when they replaced the 30 amp cords in the spring of 1999. At that time, they must have seen the burn markings on the ends of these cords, which were then stored on board and recovered after the fire.

The Rhotens' testimony about not seeing the damage to the ends of the 30 amp shore power cords and one of the female

---

**28.** The Rhotens received the Y connector in 1998 from another boater at the marina. Upon receiving the cable, Peter Rhoten inspected it and agreed there were "no markings on it." (Tr. 1, p. 71).

**29.** In fact, a day or two after the fire, Karen Rhoten admitted to Higgins that she replaced the cables because the ends "got so burned." (Tr. 9, p. 37). In particular, Higgins testified that Karen Rhoten related how "several times [she] would have to go out and throw the circuit breakers on the power station on the dock to give us power back on the boat again. And she said—and she had told me that the cables as a result of this got so burned that

she had to—the ends of them got ruined as a result of this, that she ended up replacing the cables." (Tr. 9, pp. 36–37). Higgins did not document this conversation.

**30.** Higgins' testimony was more convincing to this court than the testimony of James J. Rogers, who only became a certified fire investigator after the October 1999 fire and after his deposition, and, in any event, acknowledged the presence of pre-existing damage from electrical overheating to one of the recovered female contacts of the stored 30 amp shore power cords.

ends of the Y connector prior to the fire is against the weight of the physical evidence. Together with their unconvincing demeanor at trial on cross examination, this court finds that the Rhotens had actual notice of the pre-fire burn marks on one of the female ends of the Y connector and on the ends of the stored 30 amp shore power cords. Given the physical evidence, they also had constructive knowledge of this pre-existing damage to the Y connector and the ends of the stored 30 amp shore power cords. Accordingly, they had actual as well as constructive knowledge of the electrical issues related to the Y connector and the 30 amp shore power cords prior to the fire. At a minimum, they should have contacted an electrician and/or replaced the inlets as well as all of the cords, as advised to in the trouble shooting guide in the owner's manual that they admittedly failed to read.

In addition to the burn marks on the female end of the Y connector and the burn marks on the female and male ends of the replaced and stored 30 amp shore power cords,[31] the repeated tripping of the on dock circuit breaker, albeit not the breakers on board the M/V Just Because,[32] should have further alerted the Rhotens to the pre-existing electrical problem. As noted by Loeser, tripping the main circuit breaker, which occurred a few times in

1998 and three to four times in the summer of 1999, "should have been a danger signal to somebody." (Tr. 6, p. 28). Although Peter Rhoten did not experience the problem at other marinas and he reported the problem to the marina on one occasion in 1998, he failed to follow up or report the issue again when it continued to occur in 1999.[33] The tripping, more than likely caused from wave action with boats passing by the M/V Just Because while various appliances were being used such as the vacuum cleaner and air conditioner, should have alerted the Rhotens to a problem warranting the expertise of an electrician to examine and ascertain the cause.

### DISCUSSION

■ The Rhotens seek exoneration from or limitation of their liability for the damages caused by the October 11, 1999 fire. The Limitation Act allows a vessel owner "to limit its liability for any maritime injury or loss to the value of the vessel and its pending freight, provided that the owner lacks privity or knowledge concerning the events that gave rise to the damage." *Cape Fear, Inc. v. Martin,* 312 F.3d 496, 499 (1st Cir.2002).

■ A limitation of liability proceeding such as this one engenders a bifurcated analysis.[34] *Carr v. PMS Fishing Cor-*

---

31. As previously indicated, Higgins testified to the damage to both ends of the stored cords. Again, the Rhotens must or should have seen this pre-existing damage to the stored cords indicative of bad connections and overheating. Higgins explained that the evidence of the poor connections inside the stored cords would have been shown via "burnt plastic" visible on the outside. (Tr. 8, p. 56). As explained in the trouble shooting guide and owner's guide, "If a wiring device shows signs of overheating, it should be replaced immediately" as should the inlet and the receptacle on the dock. (Ex. 33, p. 9).

32. Peter Rhoten testified that upon the tripping of the on dock breaker, typically on a

Sunday afternoon when "everyone was there," he would check the electrical panel on the M/V Just Because. According to Peter Rhoten, the gauges did not appear different after the tripping of the on dock breaker and the breakers on the vessel had not been blown. (Tr. 1, p. 34).

33. As explained by the Rhotens' expert, it is "the responsibility of the [boat] owners to report [the tripping] to the marina operator." (Tr. 10, pp. 115–116).

34. Although the Limitation Act does not expressly extend to exoneration, courts typically "consider full immunity from liability along

*poration,* 191 F.3d 1, 4 (1st Cir.1999). First, the court determines whether negligence caused the accident. *Carr v. PMS Fishing Corporation,* 191 F.3d at 4. The first step therefore entails determining "what acts of negligence or conditions of unseaworthiness caused the accident." *Hercules Carriers, Inc. v. Claimant State of Florida,* 768 F.2d 1558, 1564 (11th Cir. 1985); *accord EAC Timberlane v. Pisces, Ltd.,* 745 F.2d 715, 720 (1st Cir.1984) ("[t]o determine the entitlement to limitation, the court must find what acts of negligence caused the accident"). Second, the court determines "whether the shipowner was privy to, or had knowledge of, the causative agent." *Carr v. PMS Fishing Corporation,* 191 F.3d at 4.

■ Claimants, as opposed to the Rhotens, "bear[ ] the initial devoir of persuasion vis-a-vis negligence." *Carr v. PMS Fishing Corporation,* 191 F.3d at 4. If claimants succeed in their showing of negligence, "the burden then shifts to the shipowner to establish its lack of privity and knowledge." *Carr v. PMS Fishing Corporation,* 191 F.3d at 4.

■ "Privity or knowledge can be actual or constructive." *Carr v. PMS Fishing Corporation,* 191 F.3d at 4 (internal quotation marks omitted). It typically "implies some degree of culpable participation or neglected duty on the shipowner's part." *Carr v. PMS Fishing Corporation,* 191 F.3d at 4; *see also* Thomas J. Schoenbaum *Admiralty and Maritime Law* § 15–6 (4th ed.2004) (issue or problem is one of determining whether shipowner "acted reasonably under the circumstances"). For example, the standard is satisfied where the shipowner "committed a negligent act … or through the exercise of reasonable diligence could have prevented the commission of the act or the onset of the condi-

tion." *Carr v. PMS Fishing Corporation,* 191 F.3d at 4.

■ Turning to the initial inquiry, this court has little, if any, doubt that the Rhotens were negligent and that such negligence caused the fire. As indicated above, the fire was electrical in nature and originated at the juncture of the upper inlet and its connection with the female end of the incoming 30 amp shore power cord. Loose connections resulted in high heat burning through the plastic material causing the fire to ignite. The failure to affix the proper locking device to the female ends of the 30 amp shore power cords, in turn, caused the development of the loose connections or, in Klopman's words, "the failure to use the locking rings was critical to the cause of the fire." (Tr. 7, p. 90).

The Rhotens's acts of negligence in causing the fire are numerous. They failed to read the owner's guide and the trouble shooting guide. The owner's guide, which contains the trouble shooting guide, warns the shipowner about what to look for at the ends of the cords, the dangers of overheating and what to do if the wiring device shows signs of overheating. It also fully explains connection rings and how to affix them to the ends of the cords. The Rhotens failed to affix the correct connection rings thereby allowing, through wave action and other vibrations, the development of loose connections at the inlet to shore power cord connections. Moreover, when they did affix connection rings, they did so improperly at the wrong end of the cords.

When discoloration on the exterior of the cords and the Y connector developed, the Rhotens simply purchased additional 30 amp shore power cords rather than having an electrician ascertain the cause of the discolorations and/or otherwise further

with the limitation question." *Cape Fear, Inc. v. Martin,* 312 F.3d at 499 n. 7.

investigating the problem. They knew or should have known about the ongoing and repeated overheating. Nor did the Rhotens report the power outages that occurred in 1999 to the marina.

The Rhotens' failure to affix the proper connection devices in the proper manner and/or their failure to further investigate the obvious signs of overheating on the cords and the Y connector proximately caused the fire.

■ With the claimants having met their burden, the inquiry devolves into the realm of the Rhotens' privity or knowledge. Given the foregoing discussion, it is evident that it was the Rhotens who committed the negligent acts that contributed to the fire. They failed to affix the proper connection devices in the proper manner. They also had actual knowledge of the overheating on the cords and the Y connector.

■ It is beyond peradventure that a shipowner "cannot close its eyes to what prudent inspection would reveal." *Joia v. Jo–Ja Service Corporation,* 817 F.2d 908, 913 (1st Cir.1987). "An owner must avail itself of whatever means of knowledge are reasonably necessary to prevent conditions likely to cause losses." *Joia v. Jo–Ja Service Corporation,* 817 F.2d at 913. The Rhotens had actual and constructive knowledge of the damage to the cords and the Y connector. They then "closed their eyes" by failing to investigate the matter and simply choose to replace the visibly damaged 30 amp shore power cords.

If the Rhotens had read the owner's guide as well as the trouble shooting guide they could have properly affixed the locking devices on the female ends of the 30 amp shore power cords. Their failure to do so contributed to causing the fire.

Similar to the testimony and demonstrations provided by Loeser and Klopman,

the evidence as a whole is compelling. The Rhotens are not entitled to limit their liability to the value of their interest in the boat. Additional discovery and a determination of damages are warranted. The third party claims against Beatty, NLCIA and NLCIC also remain outstanding.

### CONCLUSION

In accordance with the foregoing discussion, the Rhotens' petition for exoneration from or a limitation of their liability under the Limitation Act is **DENIED**. The parties shall appear for a status conference to address scheduling for further proceedings at 2:30 p.m. on July 28, 2005.